And that sets us for our first case set for argument, which is United States v. Boyajian, case number 16-50327. And we'll hear first from Ms. Landau. Landau, yes. May it please the Court. My name is Karen Landau. I represent Ronald Boyajian.  I'm going to address two issues during the argument. First, I'd like to address the argument, the issue concerning the erroneous jury instruction on count 2, the 2423C count. And second, I will address, to the extent I'm able, the issue regarding the denial of the Sixth Amendment and the District Court's refusal to consider the disgorgement of attorney's fees. The ancillary proceedings. The ancillary jurisdiction, yes, the whole. It's hard to sum it up in a couple of words. But turning to the 2423C question, so it's undisputed that the jury was not correctly instructed on the 2423C charge. And that review, really the only question for this panel, is whether the government can show that the error was harmless beyond a reasonable doubt. Well, and why isn't that? Because, I mean, the evidence here is pretty overwhelming that he was traveling. I mean, wouldn't, are you relying on the beyond a reasonable doubt portion of that? Well, no, I mean, I think I rely on a number of points. First, I argued, and I think it's quite clear that the error was preserved. If the court wants me to address that, I will. Yeah. Okay. But I'm interested in the same issue that Judge Nelson's interested in. Sure. So let me just phrase it this way. Your client makes 35 trips back and forth to Southeast Asia over the course of the years. Ten years. Nine years, yes. Excuse me? Over nine years. Yeah, over the course of nine years. This is the 36th. And there's a bunch of other stuff. He describes Cambodia as a terrible place. He's still got his California driver's license, et cetera, et cetera. It looks to me like the evidence is pretty overwhelming that he's traveling back and forth from time to time. And so why is this a case in which there's any real doubt that he's traveling during the time when the crimes occurred? Okay, a couple of reasons. First of all, if the case had been, if the instructions had been correct, the government would have had to prove that he was traveling. No, no, but they introduced lots. Sure. We all agree the instructions were improper. But there was plenty of evidence that he was traveling. Nobody argued it because the instruction wasn't there. So the question is on this record, how can we conclude that any reasonable jury wouldn't have found that he was traveling? Oh, I think you absolutely can. First of all, even though he went back and forth, let's talk about the evidence that is in the record. When he came back to the U.S., where did he stay? Did he have real property? No. There was no evidence. The government presented no evidence. He had bank accounts, property. Where did he stay when he came back? I'm sorry? Where did he stay when he came back? He stayed at his mother's. And that was the address where he was registered. I mean, you say he didn't have real property, but he had a place of residence. Well, no. I mean, he had a place to go. He had a place to go, and he was registered. He had a place of temporary residence, but that does not mean he was not a temporary or permanent resident of Cambodia. I mean, that's the thing. So what's the evidence that he was a permanent resident of Cambodia? He spent most of his time there. He traveled from Cambodia to other places for short jaunts. He lived long-term in a guest house, which admittedly he did not own property, but he lived long-term. He was there with occasional checkouts. But that's not saying I live in a hotel and I'm going to call it my, I mean, this is not a homeless person that was just traveling around. He had a job. He had a job that he worked. In California? No, in Cambodia. He worked remotely. Worked remotely for a company in? He worked remotely. For whom? I don't know that it was a company, but for an employer. Who issued his salary? He was, no, he was self-employed. He was self-employed. He wrote papers. Was it a Cambodian company that paid him, or was it a U.S. company? It was, no, I think it was different foreign students. He earned money by writing papers for foreign students and whatever you may think of that, and he did tutoring. Well, you don't need to do that anymore because we've got AIs. Well, yeah, I guess so. But he did, yeah, perhaps that's right. But he wrote, he was a tutor. I mean, that was, as I read the record, he was a tutor, and he worked remotely, and he wrote papers for people. So he lived in Cambodia. Who did he write? Different students. All we know. In the U.S.? We don't know. No, foreign students, Chinese students, Thai students, Asian students. In English? He wrote it in English? Yes, he wrote, I mean, my understanding, and the government may correct me, but my understanding of the record is that, and obviously I was not the trial lawyer, but my understanding of the record is he worked remotely, and he wrote papers, and he did it through the Internet, and that's how he made a living, and all the money was deposited into his Cambodian bank account, and that is then, there's ER sites to that in the brief. When did he become a resident of Cambodia in your view? You know, it's not clear from the record, Your Honor. It looks to me, he certainly started going to Southeast Asia in the early 2000s. It appears to me at one point he claimed residency there probably around 2005. Wait, he claimed residency in Cambodia? Yeah, it was in. Take me to something in the record. You know, off the top of my head, I can't, but there was some discussion. With your rebuttal, I would like to see. I will see if I can pull that up. I will see if I can pull that up. Because that, I mean, that's a pretty big thing to just throw out. It is. No, it was in the, like he would, you know, the government presented a lot of evidence that he, you know, he'd say, I mean, he said a lot of different things. I mean, he did say, I do want to get back to one of your points that you said, well, he claimed, he said this about Cambodia, and he claimed that he was going home. You know, a lot of people who are living abroad are going to say, well, I, you know, they're going to refer to home as where they're from. It's not necessarily that they're a resident there. Well, could you address the count three issue? The count three issue. Yeah. The jury has to, the jury is instructed on count three that there are three ways that they can find that this, your client should have, was a, was subject to registration in California. Yes, that's right. is the, he's residing in, he's a resident of California. So tell me, tell me why the count three verdict doesn't, in effect, find this fact. I don't think that's correct. Well, I know you don't, but tell me why. The jury was given a lot of options. Yes, but go through the options. See, none of the options. Let me finish my question. Yeah. None of the options seem to fit the facts of this case other than the residing one. So I'm trying to figure out, didn't the jury necessarily have to find the residing one in order to convict him on count three? No, I don't think so, because there were, first of all, he would have had to register it as a transient. Well, but that's the problem. There's no evidence that he's a transient in California, is there? Well, there was evidence that he came back and forth, and he would stay for periods of time. And the requirement to register is triggered by a whole host of things. But there are three things at issue here. So tell me what the three are. Well, the one is that, and I think it's in my brief, but the one is that you work for more than 15 days in California or you're present for more than 30 calendar days during a year. Well, if he came and visited twice for two weeks, he's a resident. I mean, he has to register. It's a very different standard. It has nothing to do with what we would call real residency, which is like domicile, which is moving somewhere with the intent to remain permanently. Do you know if there's any sex registration, sex offender registration requirements in Cambodia? I don't, but I don't believe so. My understanding is at least there was no evidence presented to the jury on that. Based on what I learned about Cambodian laws as a result of working on this case, my understanding is no, but things could have changed. Did he ever get a Cambodian driver's license? No, I don't know if driver's licenses are actually required there. The evidence was he rode a motorcycle and people ride. In Southeast Asia, that's a very common way to get around. I don't know, so I don't want to say. I really don't. I don't know that I've really—do you have further questions on this topic, or should I move on to the other issue? The other issue being? Being the counsel matter. Yeah, can I—I mean, maybe this goes to sort of what we were talking about. How did the guy get $750,000? That's a pretty big retainer. His family had money, or they had some money, and they paid for lawyers and then they couldn't pay for any more. Yeah, there was one other—I wanted to ask you about this count three again. Sure. Here's the jury instructions. It says you're required to register in California as a sex offender, quote, while residing in California, while working in California for more than 14 days, and while living in California as a transient for more than 30 days. The question is whether he was required to re-register as a sex offender at the time of this crime, correct? Right, so that would have been— And so those whiles all suggest to me that since he was in Cambodia, he wasn't working in California while he committed the crime. He wasn't living in California as a transient while he committed the crime. And so the only one of three that could apply, he was residing in California because you can reside someplace where you're not physically at the moment. So that's why I thought the jury must have found number one. Yeah, Your Honor, I don't think that's correct because California's registration requirements are intended to be extremely broad. I know, but I'm just reading the jury instructions, not the statute. But, right, if you look at the—I'm looking at the jury instruction too, and being present in California on a transient basis would appear to be somebody who comes regularly. I mean, I would say, and I think the government actually argued, that if you come to California to visit your family on a regular basis and you're required to register otherwise because of the offense that you're— You're supposed to register while you're there. Yeah, but there's no ability to register while you're there. You register annually. You don't—there's not like some special—when you register, you register. You don't just— Okay, I think I understand you. Yeah. Move on to the other thing. Okay. So in this case, yes, a $750,000 flat fee nonrefundable retainer, which frankly is illegal under California law. You can't—that's prohibited. You can have a fixed fee, but you can't make it nonrefundable unless it's a true retainer, which by definition— Were there state—I mean, first of all, I don't know why this is— I mean, the district court said this is ancillary. I tend to agree with that. So I'm hesitant to delve honestly too much into it, except I know you want to make the argument. Well, okay, so— How did it affect this trial? How did it affect this trial? He seems to have been ably represented by someone who he imagines had a conflict but didn't. And so was there ineffective assistance in any way? Well, that's not— And he had a federal public defender, and they're quite good. Well, that's not the—but that's not the standard. First of all, there was a conflict. Legally, there was a conflict. No, explain that conflict to me. I don't understand. They had an associate, the Lightfoot firm had an associate who worked for them who was employed with one of the NGOs— No, take the Lightfoot firm out of it. I'm talking about the federal public defender. But the federal public defender didn't represent him at trial. He represented himself. I know, but he—that was a decision he made to fire a perfectly competent counsel to represent himself. So my question is, even if he was deprived of access to the money, how did it affect his representation? Because this is a denial of a qualified right to counsel of choice, and that— But he didn't seek to hire anyone. He did. Actually, that's not correct. Wait. Well, then why didn't he say this to the court? I mean— He did. Oh, but he did say this to the court. He did. It's in the record. No, he said to the court, If I had three-quarters of a million dollars, I might go out and hire another lawyer. But I don't, and I don't want the federal public defender because they have this imagined conflict. But this is long after he'd already—this is long— What you're talking about happened long after the court said, I'm not getting involved. There's no jurisdiction. And— Well, the court didn't quite say— It said two things. Sometimes it said there's no jurisdiction, and sometimes it said—it recognized, I think, that it had discretion and said, I just don't want to get caught up in this side fight. But in doing so, the court disregarded the Guide to Judicial Policies and Procedures on Ancillary Jurisdiction, which says that it should be exercised when it involves the denial of a constitutional right. Well, that's why I kept asking you the question. He had—he was represented by— LSS he didn't want anymore, correct? There was a conflict. So he didn't want them. He lost faith in them. He fired them. He could have waived the conflict, assuming there was one. But that's their obligation to get the waiver in advance. Actually, the judge found there wasn't a conflict, but let's not argue about whether there was one. He fired them, and he said, I'd like my $750,000 back from them so I can go hire somebody else. And the judge said, that's a contract dispute. I don't want to take that up now. But we'll appoint the federal public defender for you. And he does. And then he says, I don't want the federal public defender anymore for reasons that I can't understand. He imagines that they're somehow in cahoots with his prior firm. And he decides to go pro se. So how was he denied a constitutional right here? So the question is, if there's a denial of a constitutional right, you go back to when that happened. And everything after that is not. What constitutional right was he denied? He was deprived of his opportunity to hire counsel of choice when the court refused to consider a pretty egregious fee issue. Can I get into the egregiousness of it? Is there any evidence of how much of that $750,000 was remaining? No, there isn't. Apparently a fair bit of work had been done. Now, granted, $750,000 is a lot of money. But attorneys can burn through money. And apparently they were going to Cambodia. I don't know. They did go twice. They did go twice. But that fee was to cover all the way through sentencing. They didn't even do the trial. So you have to figure. They didn't ever send him billable hours. No. They just said, we'll take your case. And this is what we're charging you. And I'm running out of time. But, yeah, no, they never sent billable hours. And they never submitted anything. And they didn't get a waiver. And so when you add all that together, it's pretty disturbing. If there's no more questions on this, I will save the rest of my time for rebuttal. Thank you. Good afternoon, Your Honors. David Freeman of the United States. May it please the Court. Like defense counsel, I'll start with the instructional issue with the count 2, the 2423C count. And I don't want to skip over the standard review. We do think that the standard review is plain error in this case. And the reason is fairly simple. You concede error in the jury was not properly instructed. Yes. The trial happened before Pepe. So the jury was not instructed properly. Tell me why you think it's a plain error standard. Well, the defendant did not object to any of the instructions below. At the jury instruction conference, he sort of raised this issue and then said, you know, I need to do more research. I haven't had enough time to make any objections. And he never objected to any of the instructions. So under Rule 30D, you have to make a specific objection to the jury instructions. And he didn't do that. Well, what do we do with his position in the jury instruction conference that 2423C does not apply to people who are residents of foreign countries? And the judge says you lose on that because Clark, which gets overruled by Pepe, holds to the contrary. I mean, what more does he need to do to preserve that issue? The judge made it clear that and indeed he had to rely on Clark, but he raises the issue. He says it doesn't apply to residents of foreign countries. The judge says, you know, I already dealt with that in your motion to dismiss. Clark says it does. And we're done. So what more should he have done to put the court on notice that he was raising this issue? I think he has to offer an alternate instruction. Do you really? That's what this court said in Chun. And it was a similar situation. Well, except in Chun was there really a the court had already ruled on this precise issue in dealing in a motion to dismiss. I think Chun was actually very similar. That defendant also filed a motion to dismiss, which was similar to the motion to dismiss here. And then raised it again in the jury instruction conference. And the judge said, don't bother. I've already ruled on it. Well, I mean, you know, it seems to me we're really exalting form over substance if we say that's not enough. So I would say if you look at page 184, his final sort of answer to the judge was, I'm not ready. I need more time. I need to do more research. But, you know, the standard review is not dispositive here, even under the Nader standard. We do think the error was harmless beyond a reasonable doubt. And, you know, the question is whether a jury could have found that he had permanently resettled in Cambodia. And there just was no evidence on that point. I mean, there was some. I mean, he was there 90 percent of the year. So, I mean, the idea that there's no evidence that he permanently resettled might be overstated slightly. Perhaps a better way to say it would be not evidence and not sufficient for the jury to reach a contrary finding.  But the standard here, and I want to be clear, it's not just that he was a temporary resident or a non-exclusive resident, which is how a defendant has phrased it. This court said in Jackson, travel ends when you permanently resettle. And that's the definition of travel this court endorsed in Pepe. So the question is— What did he have to do? Like, he'd have to—I mean, he'd have to give up his California driver—I mean, he could have kept it. The California driver's license is interesting because I'm not sure it shows anything. If I permanently moved to a foreign country, I don't think I'd have to give up, do I, my U.S. driver's license. Not necessarily, but I would—you know, in Pepe, one of the facts this court noted was that he did have a Cambodian driver's license. So I think having documents in Cambodia would be a marker that you've decided to resettle there. But in terms of your question, what would he have to do to sort of stop traveling to resettle, I think Jackson provides the clearest guidance on that at pages 1023 and 1024. That defendant spent a lot of time in Cambodia, and this court said his travels ended when he sold his house in the United States. He either moved all of his property or sold it, transferred it to Cambodia. And importantly— Well, but he apparently—I mean, do you agree that he had a Cambodian bank account and he was getting paid in Cambodia? He had a Cambodian bank account. I don't think there's not—there's any evidence about where he was getting paid. He was—I agree with the description of his job. He would help students essentially cheat on college exams. So he didn't have an employer in the United States. No, I think he worked for himself. But I do believe if you look at his diary, which is Exhibit 252, he had clients. He certainly had clients in the United States. There are lists of— Yeah, but having clients in the United States isn't an indicia of residence in the United States. Sure. So tell me what he would—this case, not a different case. Sure. What more would he have to have done to create at least a fact issue that gets us past harmless error on whether he had permanently resettled in Cambodia? Take steps to permanently remain in the country. And I think things like trying to accrue permanent residence. You know, he was traveling on a tourist visa. He didn't have authorization. I don't think he had authorization to work there. Actually having a permanent place to stay in Cambodia, he was staying in hotels. Now, is there evidence in this record about what one needs to do to become a permanent resident of Cambodia? In the record? Yes. I'm not sure there's evidence on that. So how do I know—I mean, how do I know that anything is required to become a permanent resident of Cambodia? Again, I would direct the court to Jackson. And that defendant actually—what this court said, he sold his house. He started accruing time towards becoming a permanent resident. And he actually was intended to apply to be a Cambodian citizen. Those are the types of things you need to do to permanently resettle in Cambodia. You know, he had a visa. I mean, the problem here is he didn't have any home to sell in the United States. So that one doesn't really help you much. I mean, I guess the tourist visa is interesting. Was that the same issue in Jackson? Was he—I mean, is that how he initially got there was on a tourist visa? And then he said he was going to apply or he had applied? There was a transition. There was a point where he was a tourist and he started to accrue time. Well, accruing time just means remaining there. What did he do positively other than sit still in Cambodia? I believe he was taking the steps to become a Cambodian citizen. How do we know that from Jackson? It's in the facts. It's what this court described. Well, so here, one fact that strikes me as pretty consequential is that when Mr.—I'll get his name wrong. When the defendant wants to go to Cambodia on this trip, he tells U.S. Customs what? That he's there for vacation, that he lives at Sharon Park Drive in Menlo Park. And so if he was—he either then lied to—well, he may not have left with the intention to permanently reside. But after he got there, he only remained there—it was four months until he was arrested, right? September to February, maybe five months? About that, yes. Did anything occur during that time period on this record from which we could—a jury could find that he changed his intention from the time that he got on the plane and went through U.S. Customs? I don't believe so. The day after his arrest, he had a flight back to the United States. See, this is why I'm having some trouble, and I've got to ask your friend to address this, about the 83 days the year before. Because whatever the 83 days were the year before, when he comes this time, he says to Customs, I'm going for vacation. You don't typically go to vacation to where you reside. Yes. So I'm trying to figure out what happened thereafter that might give rise to a jury question. He has this Cambodian bank account. Does the record tell us when that account was opened? I'm not sure. In other words, he'd been there a lot of times. Yes. Did the account preexist this trip? I believe it did. Is that in the record, or is it—? I believe the actual transcript—there's sort of an account statement, and that would probably at least tell you when some of the earlier transactions happened. It shows withdrawals and deposits. I can't recall off the top of my head. I don't think he opened the account on this last trip, is my recollection. Because I think for—and I want your friend to be able to respond to this. It seems to me the question is, what happened after he got there this time that turned him into a Cambodian resident? Because when he came this time, he told Customs he was on vacation. Sure. So I'm not really much concerned about his 34 previous trips and returns. I'm trying to figure out what happened this time that turned him into a Cambodian resident. There's nothing that suggests his intention remained. Again, he had a ticket back to the United States. He was still staying at guest houses. Did he have a ticket back, or did he have an open return? He had a ticket on February 20th to go back. Well, but that was after he was arrested, wasn't it? Yes. I'd want to get out of Cambodia, too, even if I was— Well, no, no, no, no. He had plans to go back on February 20th. Okay. So he had a ticket before he was arrested. Did the government know that's why they arrested him before he— Well, part of it was he was also spotted in this village in Sepak, and they thought he was potentially abusing children. But did he have that ticket before the arrest? Yes. With that date? Yes. Okay. It was a round-trip ticket, I want to be fair, but he had a ticket to go back to the United States. Right, but I thought the round-trip ticket was without a specific date of return. I believe the week before he bought a ticket to go back on February 20th, he did think possibly that NGOs were following him. He also switched guesthouses. I think that shows another thing. He claims he was sort of a permanent occupant of this international guesthouse. He actually switched guesthouses. How often did he switch guesthouses? I'm not sure we have specifics on that. In those four months, did he—like, he switched once or like multiple—like every week or—? We know on that final trip he skipped it. He switched at least once, and I know there's at least one other guesthouse that's mentioned in the record. But he was not always at the international guesthouse. And a guesthouse, just so I'm clear, is that tantamount to what we would call a hotel? Yes, and I think the district court found that. I think even the defendant agrees that. It's a hotel. And that's actually a fact the Fourth Circuit found very significant in the Schmidt case. That's a case that's cited approvingly by Pepe. So if he'd signed a lease over there, would that be enough evidence for us to say, wait a second, we've got to go send this back? I'm not sure that would be a harder case. I'm not sure that alone, given that he still had his U.S. travel documents. What if he signed a 10-year lease? Again, I think that would be a more difficult situation. I think what you really need to see is how is he going to permanently remain in the country? Does he have some sort of permanent status? And the Fourth Circuit found that particularly significant in Schmidt. That defendant spent 18 months in the Philippines and can't vote again. I understand that that's indicia, but I'm not sure that it's required. I mean you can certainly live in another – I mean you could reside in another country without being there legally even, I assume. You could, but in this case we have someone who all their connections were in the United States. He's telling the California DMV. He's registering as a sex offender. And it's not just maybe he lies to U.S. Customs, but there was an informant in this case. Did he update his California driver's license? Do you know? I believe he had plans to do so. That was actually something that was listed in the diary. He planned to do that later, maybe that year. This is a difficult case in this sense. We're trying to figure out whether an error was harmless beyond a reasonable doubt, not whether a jury could have reasonably concluded that he didn't intend to permanently reside there. So it seems to me your burden in this case is to show us that there's no reasonable jury could have concluded on the evidence in front of it that he didn't intend to permanently reside there. Yes, and I think what all he's offered up here is sort of his Cambodian bank account and that he spent a lot of time in Cambodia. And when you look at everything else on the other side, all the ties to the United States, his registry, his statements to the informant, to Menlo Park PD, to Customs, that all shows he considered that place his permanent residence. And we do have the finding on count three, and that's another key distinction with Pepe. And I'm going to ask you about that next. So when I first saw this argument, it seemed to me the jury was offered three alternative ways to convict him on count three. And do you agree that two of them really don't require that he not be a permanent resident of Cambodia? In the work and transient routes, I agree, yes. So if a jury found that he qualified for registration under those two, it would not at all be inconsistent with him having the intention to be a permanent resident of Cambodia? There would be some tension, but the jury could make that finding. Okay, so why then does the count three verdict establish that he was not a permanent resident of Cambodia? So I would direct the court to the way we argued this in closing, and I'm not sure if this is in the many excerpts of records that have been submitted. This was the morning of March 4th, starting at around page 45. Our primary argument was that he was residing in California. And, you know, we did mention the possibility of the transient, so I don't want to— Well, you argued your strongest thing, but that doesn't mean the jury found on your strongest argument. But I do believe I agree with your comments earlier that that was really the primary argument, the most logical reason the jury would have found that he was residing in California. But his argument sort of was the other way. His argument was it doesn't help him on this count. His argument on the other count was, no, I'm just a transient in California. Home is Cambodia. And the jury could have sat there and said, well, maybe, you know, maybe he's right on that because nobody cares whether he's a transient. We haven't gotten that instruction on count one. But even if he's right, he's still guilty on count three. So I think the defendant's alternate argument has been that he was residing perhaps in both places. He hasn't really mentioned this transient argument. And, you know, I concede it would be technically possible for the jury to find he was a resident on count three but not on count two, but it would certainly be somewhat unlikely given the evidence that was submitted here. We argued forcefully. Yeah, but unlikely is not collateral selfful. In other words, don't you have to say they necessarily found it beyond a reasonable doubt on count three? Not that they likely found it or it's probable that they found it. Well, this Court—I think this is another data point this Court could consider. That wasn't in Pepe that they found he was a resident for purposes of count three. We don't need that they necessarily made that finding. And that's—Nader sort of rejects that argument that the jury has to—you have to rely on— No, Nader says if the evidence is overwhelming on a point, then the failure to instruct on it can be harmless error. Yes. Nader doesn't deal with a sort of collateral estoppel argument like you're making here. Well, I'm not—I want to be clear. I'm not making a collateral estoppel argument. Oh, you're saying it was resolved through the count three verdict. I'm saying this is another piece of evidence that the jury wouldn't have reached a contrary result. I'm not saying it was conclusively resolved. I agree there could have been inconsistent findings. But this is another piece of evidence this Court can look at, and this Court should look at the entire record here. And when you consider, you know, the evidence of California residency, the sort of meager sort of counter evidence that maybe he'd permanently resettled in Cambodia, and the fact that we do have a jury finding on at least a standard of residency, I think this Court can be comfortable that a jury wouldn't have reached a different result. Can you address the ancillary jurisdiction argument? Sure. And let me just make sure I have the facts correct here. Mr. B—the defendant says, I want to fire LSS. Yes. Because I think they have a conflict of interest because one of the associates there used to work for the government. And the judge says, well, it's not really a conflict. You didn't work on anything related to this and have any information related to your case. But they're your retained counsel. If you want to fire them, you can fire them. And he says, I do. And then he says, and I'd like you to order them to give me all my money back, the retainer back. And the judge says, I'm not going to get caught up in that mess. And then appoints the federal public defender as counsel, right? Yes. And then the defendant says, I don't want them at some point. I want to proceed pro se. Yes. And says at that proceeding, I'm not looking for other counsel at this point. I just want to proceed pro se. His argument, as counsel says, is, look, if I'd gotten that money back, I wouldn't have been able to retain counsel of my choice. Is that a—let's assume that's true. Does that make that a constitutional deprivation? We would say no because— Of course you would say no. Tell me why. Well, because there's essentially no state action. Unlike Luis or Kayleigh, this isn't a case where the government took the defendant's money and then sort of maybe withheld it from him in a way that prevented him from getting the counsel he wanted. He has a dispute with a third-party law firm. It's not the government's fault. It's not the district court's fault. But the difference here is that the district court could have exercised jurisdiction. I think we all agree with that. It could have. Yes. This isn't like a robber who comes into your home and steals your money and therefore you can't— the district court wouldn't have had jurisdiction over that matter. Sure. So why shouldn't—I mean, I guess, are there examples where ancillary jurisdiction becomes mandatory? Or is your position just ancillary? That's the definition. You don't have to exercise it. I think it's discretionary. I think even defending— But there can be an abuse of discretion. There could be an abuse of discretion, sure. Why wasn't there one here? I think the district court issued a very thorough order on this at FER 58 to 60. She gave three good reasons for not exercising jurisdiction. One was that this case had been delayed for six years. She didn't want to get involved. And the second was she didn't want to get involved in a state dispute. A defendant could have presented this case in state court. He still hasn't done it. And third, perhaps most important, it wouldn't have actually helped advance the district court's interest. It wouldn't have helped resolve this trial any faster. It might have, in fact, delayed it even further. Well, it might have delayed it, but it might have made it—I mean, it would have taken this argument off the table potentially. Was there any—I guess there was no—I mean, because it was never entertained. You have no knowledge of how much of the 750 had been spent or—I mean, none of these arguments were ever— That was not litigated. I do agree that it likely was not—there was not much left. The district court noted at, I believe it's 602 of the supplemental excerpts that— Well, one problem with the retainer is we never know how much is left. That's fair, yes. What was left was there—in the absence of them being fired was their obligation to defend him through verdict. But it had been a year. They had done a lot of work. They had filed a lot of motions. They had gone to Cambodia. It was only a year. Is that right? It was about a year. Yeah, I believe so. About February 2012 to maybe March 2013. And I would also just note the district court—the defendant said he had enough money to hire a counsel of his choice. And the district court offered to get CJA funds to hire a second one. And as far as we're aware, he never took the court up on that offer. Can I ask you about something that doesn't seem to affect the outcome in this case? Sure. There's an enormous passage of time between the arrest in Cambodia and his expulsion from Cambodia and his trial. What took this thing so long? Why was there six years of—? Well, you can say the same thing about this appeal. It's been the defendant's persistent dissatisfaction with counsel. He had numerous attorneys in the district court. Yeah, without casting blame, was it the changing of lawyers that made it take so long? Yes. Yes. I think that's an objective way to say it. I'm not going to say it's wrong or right, but he changed lawyers several times and eventually went pro se, and that was the source of almost all of the delay in this case. I see I'm out of time. If there's any more questions, I'm happy to answer them. But otherwise, thank you. Thank you. So I wanted to talk about the government has argued that basically that it mostly argued that—it forcefully argued that Boyajian was a resident for purposes of— Thank you. Boyajian is the correct pronunciation? Boyajian, yes. Thank you. Thank you. No problem. That he was a resident for purposes of count three and that that should be on count two. In fact, and this is at ER 192, the government says residency doesn't matter. They said—so he says— But it doesn't really matter what the government said. No, but it's relevant in the sense that it's relevant to show that the jury might well have focused on the transient issue. That's my point. The second thing is— Is your position that if we agree with you that there is daylight on count three, that's enough that, you know— Yeah, I think— You can't conclusively determine it, I mean, any other way. I agree. Yes, that is my position. I also think even if you don't agree with that position, but there is enough record in the—there's enough evidence in the record that he was not—that he was a resident of Cambodia that it's not overwhelming. And that is the standard. Well, but there's two separate issues, so I want to make sure I understand. Yeah. On count three, you're not challenging the sufficiency of the evidence. Oh, no, we didn't challenge it, no. Okay. So what you're saying is on count—is it one or two? It's count two. Count two, even though it's the first one we're talking about. Yes, yes. The 2423C count. That's right. On the 2423C count, you say there's enough in this record so that we can't conclude that not asking the jury to determine whether he was still traveling was harmless error. That's correct. That's correct. I wanted to answer a couple questions that came up. In terms of Mr. Boyajian switching residents, the evidence was he switched residents once during this period toward the end after he did— Residents. Hotels. Yes. Hotels. And, you know, I will say that guest houses—well, I mean, I tell them— Is there a reason to believe they're different than hotels? Are they more permanent? They're guests. They're more like family-run. I've traveled a lot in Asia, so they're family-run. A lot of times they cater to long-term. Many of them have meals. That's right. It's kind of like a B&B. So let's assume that's a neutral fact. It doesn't cut one way or the other. Yeah. Could you respond to my concern that when he comes to Cambodia this time, he tells U.S. officials, I'm going on vacation, which is not consistent with going to a place that you've already decided you're going to permanently reside in. So what occurs thereafter to demonstrate that he's now made the decision to permanently reside in? Well, there's a couple things. First of all, he may have said that, but he said all kinds of things on different occasions to law enforcement agents. Did he ever tell a law enforcement agent that he resided in Cambodia? You know, you ask me that, and I'm looking through the record. It's going to take me some seeking to find that. So I will submit it in writing. But what I will say is he had a long-term visa, which was good for multiple entries. It was good for 13 months. So it wasn't like he just came in on a six-week vacation. What kind of visa was it? No, because that's when you're saying long-term. I mean, I don't think it does. But wasn't it a tourist visa? I think it's a, yeah, but I think all the visas are tourist visas unless, I mean, you'd have to become a citizen. I don't even know if that's possible in Cambodia. Certainly there's no evidence in the record about how one would go about doing that or, you know, this wasn't. Well, apparently Jackson, they took, isn't that the case where he took? I think Jackson, yeah, Jackson was. And those weren't taken here? No, they weren't. They weren't. But I don't think you have to renounce your citizenship to establish residency in another place. No, no, I'm just looking for some affirmative evidence that he had decided to permanently reside. And I'm trying to move forward from the time that he left the U.S. on this last trip until the time he was arrested. And I think the affirmative evidence is that he did have a visa that allowed for multiple entries so he could go back and forth to other countries, which he did. There's evidence of that. He also, there was another point. Oh, yes, the ticket was not, he wasn't buying round-trip tickets from the U.S. He was buying round-trip tickets, Cambodia, Los Angeles, Cambodia, Cambodia. Does that make a difference? Well, it's evidence that he considered that his home base. And intent is part of the residency determination. Did he agree with what the government said, that the ticket to return on the 20th had been purchased before the arrest? Oh, yeah, yeah, of course. And it was back to the L.A. It's undisputed, yeah. I don't dispute that, yeah. No, he was going back. Your point is he could have just been going back for a visit. Yeah, I mean, whatever. Honestly, there are a lot of people who live most of their time in Southeast Asia, some of it for nefarious reasons, some of it because it's a lot less expensive to live there. They come home for things like medical treatment. They come home to see their families. And he certainly spent most of his time. Right, but I think, well, fair point. Okay. Thank you. Thank you very much. Thank you. And thank you for your professional representation. I saw that your client's motion before the Supreme Court was denied. That can't be easy to see the ancillary issues going. You've done a great job of representing someone who may not fully want your representation. That's true, but thank you for your appreciation. Thank you. The case is now submitted.
judges: KLEINFELD, HURWITZ, NELSON